UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Khadijo Nunow, *individually, and on behalf of all others similarly situated*,

Plaintiff,

v.

FEI.COM, Inc., *doing business as FEI Systems*,

Defendant.

File No. 26-cv-1598 (ECT/DTS)

**OPINION AND ORDER**

---

Mark T. Freeman and Scott Edward Cole, Cole & Van Note, Oakland CA, and Rhett A. McSweeney, McSweeney/Langevin LLC, Minneapolis, MN; and for Plaintiff Khadijo Nunow.

Jesse E. Sater and Anzario Serrant, Nelson Mullins Riley & Scarborough LLP, Minneapolis, MN, for Defendant FEI.COM, Inc.

---

This is a data breach case. The facts are bare-bones. Defendant FEI.COM, Inc. operates a computer platform called "MnCHOICES." Compl. [ECF No. 1-1] ¶ 18. According to the Complaint, MnCHOICES enables users who the Complaint does not identify "to determine individuals' eligibility for certain government programs." *Id.* ¶ 18.[1] Plaintiff Khadijo Nunow's personally identifiable information was stored on

[1] According to the Minnesota Department of Human Services, "counties, tribal nations and managed care organizations" use MnCHOICES "to support their assessment and support planning work for Minnesotans who need long-term services and supports." *MnCHOICES*, Minn. Dep't of Hum. Servs., https://mn.gov/dhs/partners-and-providers/news-initiatives-reports-workgroups/long-term-services-and-supports/mnchoices/ (last visited Aug. 27, 2026).

MnCHOICES, along with the personally identifiable information belonging to "at least 303,965" other individuals. Compl. ¶ 1. This information included "names, sex, dates of birth, phone numbers, Medicaid ID, last four digits of Social Security numbers, and addresses," among other information. *Id.* FEI discovered a "cyberattack" targeting MnCHOICES on November 18, 2025. *Id.* ¶ 2. In this cyberattack, an unauthorized individual "infiltrated" MnCHOICES and "accessed" the personally identifiable information kept on it. *Id.* In a letter dated January 16, 2026, the Minnesota Department of Human Services notified Ms. Nunow and others whose personal information was stored on the MnCHOICES platform of the data breach. *Id.* ¶ 3; *see* ECF No. 12-2.

Ms. Nunow filed this case four days later, on January 20, 2026, in Ramsey County District Court. *See* Compl. at 1 (indicating in court filing stamp that case was filed at 8:42 a.m. on that date). She asserts three legal theories: (1) Ms. Nunow claims FEI acted negligently in failing to protect the privacy of her information on MnCHOICES. *See* Compl. ¶¶ 67–91. (2) Ms. Nunow claims FEI's failure to protect the privacy of her information breached an implied contract. *See id.* ¶¶ 92–99. (3) Ms. Nunow claims this same failure breached an implied covenant of good faith and fair dealing. *See id.* ¶¶ 100–04. The Complaint did not identify a source of law for these claims. *See generally id.* However, in her brief in opposition to FEI's motion, Ms. Nunow cited Minnesota law as the source of her claims. *See* ECF No. 20 at 23–32.[2] For relief, Ms. Nunow seeks certification of a class comprised of herself and others whose personal information was

---

[2] Page citations are to pagination assigned by the court's CM/ECF system appearing in a document's upper right corner, not to a document's original pagination.

stored on MnCHOICES, damages caused by the data breach, extensive injunctive relief that would, for example, require FEI to implement specific cybersecurity measures and educate class members regarding the risks associated with data breaches, prejudgment interest, and attorneys' fees and costs. *Id.* at 28–30. After being served with the Complaint on January 22, 2026, Notice of Removal [ECF No. 1] at 2, FEI removed the case from Ramsey County District Court to this court on February 23, 2026, *see id.*

FEI seeks the case's dismissal. FEI's front-line contention is jurisdictional. It argues that Ms. Nunow has failed to plausibly allege an Article III injury resulting from the data breach. As a fallback, FEI argues the case should be dismissed on its merits. The short answer is that the case will be dismissed because the Complaint does not allege facts plausibly showing that Ms. Nunow either suffered an injury, or that she faces an imminent injury that is substantially certain to occur, sufficient to establish her Article III standing.

I

Before turning to the Article III standing problem, the separate question of whether the case meets the Class Action Fairness Act's (or "CAFA's") jurisdictional prerequisites deserves discussion. "CAFA gives federal courts jurisdiction over certain class actions, defined in [28 U.S.C.] § 1332(d)(1), if [1] the class has more than 100 members, [2] the parties are minimally diverse, and [3] the amount in controversy exceeds $5 million." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84–85 (2014) (citing 28 U.S.C. § 1332(d)(2), (5)(B)). As the removing party invoking jurisdiction, FEI bears the burden of showing these requirements are satisfied. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Rolwing v. Nestle Holdings, Inc.*, 666 F.3d 1069, 1071

(8th Cir. 2012) ("In the CAFA context, the party seeking removal bears the burden of proving by a preponderance of the evidence that the jurisdictional requirements for removal are met."), *abrogated in part on other grounds*, *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588 (2013). It does that by filing in this court "a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart*, 574 U.S. at 83 (quoting 28 U.S.C. § 1446(a)). In *Dart*, the Supreme Court interpreted § 1446(a)'s "short-and-plain-statement" requirement to mean that a removing defendant must include factual allegations plausibly showing that CAFA's jurisdictional elements are met. *Id.* at 87–89. It doesn't matter that Ms. Nunow didn't object to removal or raise the CAFA-jurisdiction question. A federal court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citation omitted); *see also Johnson v. Welsh Equip., Inc.*, 518 F. Supp. 2d 1080, 1085 (D. Minn. 2007) ("Lack of subject matter jurisdiction cannot be ignored by the court or waived by the parties. A question of subject-matter jurisdiction may be raised by the court *sua sponte* at any time." (citation modified)).

The numerosity and minimal-diversity requirements are not in question here. Ms. Nunow alleged in her Complaint that there are "at least 303,965" potential class members, Compl. ¶ 1, and FEI cited this figure in its Notice of Removal as the basis for its allegation that the proposed class exceeds CAFA's jurisdictional numerosity floor, Notice of Removal at 5. Regarding diversity, Ms. Nunow alleged in her Complaint that she is a Minnesota citizen. Compl. ¶ 8. FEI is a corporation, so to determine its citizenship (and

whether it is different from Ms. Nunow's) we need to know the state "by which it has been incorporated" and the state "where it has its principal place of business." 28 U.S.C. § 1332(c)(1). In her Complaint, Ms. Nunow addressed only the latter, alleging that FEI maintains its principal place of business in Maryland. Compl. ¶ 18. Though FEI did not identify its state of incorporation or principal place of business explicitly in its Notice of Removal, FEI alleged generally that it is a Maryland citizen and cited the Complaint's allegation that it maintains its principal place of business there. Notice of Removal at 5 (citing Compl. ¶ 18). I understand this general allegation to encompass the more-specific allegation that FEI is incorporated under Maryland law, and, if it mattered, FEI confirmed that fact at the hearing. Tr. (rough) at 2.

CAFA's $5 million amount-in-controversy requirement is in question, and several rules apply to address this issue. Begin with rules that apply to cases in which a plaintiff requests monetary relief. "If the plaintiff's complaint, filed in state court, demands monetary relief of a stated sum, that sum, if asserted in good faith, is 'deemed to be the amount in controversy.'" *Dart*, 574 U.S. at 84 (quoting § 1446(c)(2)). In other words, if the plaintiff's state-court complaint includes a good-faith, explicit demand for monetary relief in an amount greater than $5 million, the removing defendant need only repeat that demand in its notice of removal to plausibly show that CAFA's amount-in-controversy requirement is satisfied. When the plaintiff's complaint seeks monetary relief but "does not state the amount in controversy, the defendant's notice of removal may do so." *Id.* In this situation, there are conceivably many ways a defendant might allege facts plausibly showing that the amount in controversy exceeds CAFA's $5 million threshold. A

defendant might, for example, extrapolate by inferring controverted amounts from the plaintiff's asserted claims and requested damages categories. *See, e.g.*, *Pirozzi v. Massage Envy Franchising, LLC*, 938 F.3d 981, 982–83 (8th Cir. 2019). A defendant might include factual allegations beyond those in the complaint. *See, e.g.*, *Salter v. Quality Carriers, Inc.*, 974 F.3d 959, 961–62 (9th Cir. 2020). Or a defendant might identify damages categories that, although not mentioned in the complaint, the plaintiff might plausibly recover. *See, e.g.*, *Back Drs. Ltd. v. Metro. Prop. & Cas. Co.*, 637 F.3d 827, 831 (7th Cir. 2011). Regardless of how a notice of removal is designed to accomplish this task, determining whether a complaint that requests monetary relief meets CAFA's $5 million threshold is not intended to be difficult. "[T]he claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(6). CAFA "tells the District Court to . . . add[] up the value of the claim of each person who falls within the definition of [the] proposed class and determine whether the resulting sum exceeds $5 million." *Knowles*, 568 U.S. at 592; *Faltermeier v. FCA US LLC*, 899 F.3d 617, 621 (8th Cir. 2018) ("[A] district court aggregates the claims of all named or unnamed persons who fall within the definition of the *proposed* or certified class." (citation modified)).

Next consider the rules that apply to determine the amount in controversy in cases in which a plaintiff requests non-monetary relief either alone or in addition to monetary relief. The Supreme Court has made clear that, "[i]n actions seeking declaratory or injunctive relief, . . . the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977). For

CAFA's purposes, the question is: Value to whom? Is it just the value a plaintiff and her proposed class might gain by obtaining the requested injunctive relief? Or does a defendant's cost of compliance with requested injunctive relief count too? Our Eighth Circuit Court of Appeals has not answered this question explicitly. *See Lizama v. Victoria's Secret Stores, LLC*, 36 F.4th 762, 765 (8th Cir. 2022) (declining to resolve "whether the amount in controversy should be measured only from the plaintiffs' perspective—*i.e.*, the aggregate value of the claims to the class members—or whether a district court may determine the amount from either party's point of view, and thus may consider the amount from the defendant's perspective—*i.e.*, the total potential cost to the defendant if the plaintiffs prevail" because the defendant "did not meet its burden to show an amount in controversy over $5 million from either perspective"); *see also Waters v. Ferrara Candy Co.*, 873 F.3d 633, 636 (8th Cir. 2017) ("We need not resolve the issue of whether courts should apply the plaintiffs' viewpoint rule or the either viewpoint rule when determining the amount in controversy under CAFA because Ferrara did not meet its burden under either rule."). But I think the Eighth Circuit answered the question implicitly in favor of the either-viewpoint rule in *Leflar v. Target Corp.*, 57 F.4th 600 (8th Cir. 2023). There, the plaintiff claimed that Target failed to make written warranties reasonably available, and he sued on behalf of a proposed class. *Id.* at 602. "Rather than remain in state court, Target filed a notice of removal based on the jurisdictional thresholds in [CAFA.]" *Id.* The Eighth Circuit reversed a district court order remanding the case to state court because the district court applied a "nonexistent presumption" favoring remand, *id.* at 603–04, and because the district court failed to consider a post-removal declaration

Target filed in which its "lead compliance consultant . . . estimated that Target would have to spend over $7.5 million if Leflar wins," *id.* at 605. As the Eighth Circuit described it, "[t]he declaration even separated [Target's] costs of compliance into individual categories like extra signage, additional training, and the introduction of in-store warranty-retrieval systems." *Id.* The Eighth Circuit made clear that the district court's refusal to consider the declaration "'effectively denied' the company 'the opportunity . . . to establish [its] claim of federal jurisdiction.'" *Id.* (quoting *Pudlowski v. The St. Louis Rams, LLC*, 829 F.3d 963, 964 (8th Cir. 2016) (per curiam)). Because the declaration "shed[] light" on the amount in controversy, the Eighth Circuit explained, "the district court should have considered it." *Id.* (citation modified). The Eighth Circuit's direction that the district court consider this declaration on remand makes sense only if the court adopted the either-viewpoint rule for purposes of CAFA's amount-in-controversy requirement, even though it did not mention the rule by name. But for adoption of the either-viewpoint rule, a declaration describing Target's costs of complying with the plaintiff's requested injunctive relief would not matter.

In its Notice of Removal, FEI plausibly alleges that this case meets CAFA's $5 million amount-in-controversy threshold based—not on the monetary amount in controversy—but on FEI's costs of compliance with Ms. Nunow's requested injunctive relief. Begin with the former. The Complaint seeks monetary relief, "including actual, nominal and consequential damages," along with attorneys' fees, and costs, Compl. at 29–30, ¶¶ 2, 7, but it nowhere specifies a sum for these categories, *see generally id.* In its Notice of Removal, FEI tries to fill that gap by measuring would-be class members'

damages by reference to the Complaint's allegations regarding the value of their personal information in a secondary market. Notice of Removal at 6; *see* Compl. ¶¶ 56–57. As FEI points out, Ms. Nunow "claims personal information 'can be sold at a price ranging from $40 to $200,' and that 'criminals also purchase access to entire company data breaches from $999 to $4,995.'" Notice of Removal at 6 (quoting Compl. ¶ 57). FEI alleges that these figures "bring this case well within CAFA's amount-in-controversy requirement" because, assigning "the lowest alleged valuation" of $40 as each potential class member's damages "produces class-wide damages exceeding $12 million." *Id.* These allegations do not plausibly show an amount in controversy. In her Complaint, Ms. Nunow nowhere tethers her damages request to the value of her private information on an illegal market. *See generally* Compl. Though market value might be a plausibly appropriate damages measure in many cases (*e.g.*, a case seeking insurance coverage for a destroyed vehicle), it is difficult to see how that might be so here. I cannot identify a rational connection between a data-breach victim's monetary harms and the value of that victim's private information to others on an illegal market. FEI identifies none.[3] Nor does FEI cite a case or other authority supporting that connection.

Regardless, FEI's allegations regarding its compliance costs are sufficient. As FEI describes things,

> Plaintiff asks the Court to order FEI to undertake sweeping operational and technological changes, including: retaining independent third-party security auditors; performing regular

[3] In support of its motion to dismiss, FEI pointed out that "there is no allegation that plaintiffs intended to make use of an opportunity to sell their private information." ECF No. 11 at 18.

> automated security monitoring, simulated attacks, penetration tests, and audits; prohibiting FEI from maintaining Private Information on a cloud-based database; implementing annual and role-specific information-security training for all employees; instituting employee testing protocols to ensure compliance with FEI's policies; establishing, maintaining, and periodically updating an enterprise-level threat-management program; and providing ongoing education to hundreds of thousands of Class Members regarding risks and preventative steps related to the alleged breach.

Notice of Removal at 6–7. FEI's description of these "operational and technological changes" is reasonably grounded in the injunctive relief Ms. Nunow requests in the Complaint. *Compare id.*, *with* Compl. at 29–30, ¶¶ 5(a)–(l). FEI claims these extensive measures would cause it to incur compliance costs greater than $5 million. Notice of Removal at 6–7. Though FEI could have been more specific, it wasn't required to be. These allegations plausibly show "that the case *might* be worth more than $5 million" from the viewpoint of FEI's compliance costs. *Leflar*, 57 F.4th at 603.

After FEI removed the case here, it filed evidence showing that a factfinder might legally conclude that the case might be worth more than CAFA's $5 million floor. Why FEI submitted this evidence, and what it shows, warrants a brief explanation. Allegations plausibly showing the amount in controversy don't end the inquiry—they may be "contested by the plaintiff or questioned by the court." *Dart*, 574 U.S. at 87. "In such a case, both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Id.* at 88. In this situation, the precise question is whether a preponderance of the evidence shows that it is legally impossible for the plaintiff to recover more than $5 million. *See Pirozzi*, 938 F.3d

at 984 ("When the notice of removal plausibly alleges that the class *might* recover [amounts] aggregating more than $5 million, 'then the case belongs in federal court unless it is *legally impossible* for the plaintiff to recover that much.'" (quoting *Raskas v. Johnson & Johnson*, 719 F.3d 884, 888 (8th Cir. 2013))). "Even if it is highly improbable that the Plaintiffs will recover the amounts Defendants have put in controversy, this does not meet the legally impossible standard." *Id.* (quoting *Raskas*, 719 F.3d at 888).

After the hearing on FEI's motion, I ordered the parties to file additional briefs "addressing the factual and legal basis for CAFA subject-matter jurisdiction." ECF No. 27. Whether this request was justified (or not), the parties complied. *See* ECF Nos. 28–30. With its brief, FEI filed the declaration of its general counsel, Scott Morrow. ECF No. 29. In his declaration, Mr. Morrow testified regarding FEI's compliance costs associated with Ms. Nunow's specific requests for injunctive relief. For example, regarding Ms. Nunow's demand that FEI be "prohibit[ed] . . . from maintaining . . . Plaintiff's and Class Members' Private Information on a cloud-based database," Compl. at 30, ¶ 5(f), Mr. Morrow testified that compliance with this request would require FEI to convert the MnCHOICES system "to a server-based infrastructure" at a cost of between $20 and $30 million, ECF No. 29 ¶ 7. And, as another example, Mr. Morrow testified that FEI's cost to comply with Ms. Nunow's demand that FEI be required to "meaningfully educate all Class Members about the threats that they face" and "the steps affected individuals must take to protect themselves," Compl. at 30, ¶ 5(l), also would exceed $5 million, ECF No. 29 ¶¶ 8–10. Ms. Nunow characterizes Mr. Morrow's declaration testimony as "untested and self-serving" and the estimates in it as "inflate[d]," ECF No. 30 at 3, 5, but she offers no evidence to

counter Mr. Morrow's sworn testimony, much more information tending to show that FEI's costs of complying with her requested injunctive relief would be less than $5 million. On this record, FEI has shown by a preponderance of the evidence that the amount in controversy exceeds $5 million. *See Leflar*, 57 F.4th at 604.

II

A

Turn now to FEI's motion to the extent it seeks dismissal based on a lack of subject-matter jurisdiction. A court reviewing a motion to dismiss for lack of subject-matter jurisdiction must first determine whether the movant is making a "facial" attack or a "factual" attack. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015). A facial attack challenges only the complaint's jurisdictional allegations; that is, it challenges jurisdiction on the face of the complaint. "Conversely, in a factual attack, the existence of subject matter jurisdiction is challenged in fact, irrespective of the pleadings, and matters outside the pleadings . . . are considered." *Id.* at 914–15 (citation modified). Here, FEI advances a facial attack to subject-matter jurisdiction. It accepts the truth of the jurisdictional allegations in the Complaint and argues these allegations are insufficient. *See* ECF No. 11 at 16; *see Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).

In a facial attack, "the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted). In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's

favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Jurisdictional allegations, like any other allegations in a complaint, are subject to Rule 8(a)'s standard of "a short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1). To meet this requirement, a plaintiff must satisfy the plausibility standard of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Penrod v. K&N Eng'g, Inc.*, No. 18-cv-2907 (ECT/LIB), 2019 WL 1958652, at *3–4 (D. Minn. May 2, 2019) (applying the *Twombly*/*Iqbal* plausibility standard to jurisdictional allegations); *Hawse v. Page*, 7 F.4th 685, 688–89 (8th Cir. 2021) (same); *Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018) (same). In other words, the complaint must contain "enough facts" to nudge the showing of subject-matter jurisdiction "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). A complaint must include "factual content that allows the court to draw the reasonable inference" that there is subject-matter jurisdiction. *Id.* at 678–79 (describing this as a "context-specific task" that requires the court "to draw on its judicial experience and common sense").

Ordinarily, a federal court does not consider matters outside the pleadings in resolving a Rule 12(b)(6) motion or, it follows, in resolving a facial challenge to subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(d); *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Regardless, the law is clear that several categories of documents beyond a pleading's allegations appropriately may be considered in this procedural context. These include "matters incorporated by reference or integral to the

claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Zean*, 858 F.3d at 526 (citation omitted). Here, the Complaint references the Department of Human Services' data-breach notice—the letter it sent to Ms. Nunow and others whose personal information was stored on the MnCHOICES platform—dated January 16, 2026. *See, e.g.*, Compl. ¶ 3. The notice details the unauthorized access of data in the MnCHOICES system. ECF No. 12-2. FEI filed the notice with its motion, *see* ECF No.12-2, and no one disputes the document's authenticity. For these reasons, the notice appropriately may be considered in adjudicating FEI's motion.[4]

B

The standing doctrine "serves to identify those disputes which are appropriately resolved through the judicial process"—in other words, those disputes that qualify as "Cases" or "Controversies" under Article III. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); U.S. Const. art. III, § 2. A plaintiff meets "the irreducible constitutional minimum of standing" when (1) he has suffered an "injury in fact," (2) there is "a causal connection between the injury and the conduct complained of" that is "fairly traceable to the challenged action of the defendant," and (3) it is "likely . . . that the injury will be redressed

[4] FEI filed several other exhibits to support its motion. These included an FEI webpage discussing MnCHOICES, ECF No. 12-1, a Department of Human Services memorandum regarding a 2019 MnCHOICES Request for Proposal that "provides context to the working relationship between [the Department] and FEI," ECF No. 12-3, a Department webpage discussing MnCHOICES, ECF No. 12-4, and slides from a Department-created presentation, ECF No. 12-5. It is not necessary to consider these documents in adjudicating FEI's jurisdictional challenge.

by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation modified). The named plaintiff in a putative class action "must . . . allege facts establishing the elements of [her] own standing, and may not rely on the injuries of unidentified class members." *Hall v. Centerspace, LP*, No. 22-cv-2028 (KMM/DJF), 2023 WL 3435100, at *3 (D. Minn. May 12, 2023) (first citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 & n.6 (2016); and then citing *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017)). The Supreme Court has instructed that "[i]n an era of frequent litigation [and] class actions . . . courts must be more careful to insist on the formal rules of standing, not less so." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011).

The issue here is whether Ms. Nunow has shown Article III injury, and several rules govern this question. The Supreme Court has explained in some detail what makes a past or present injury "concrete" for Article III's purposes. *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–430 (2021). A "concrete" injury is "real, and not abstract." *Spokeo*, 578 U.S. at 340 (citation modified). Complaints that allege "economic or physical harms" are almost always no-doubters. *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 642 (2007) (Souter, J., dissenting). This is true even if the alleged harm is "only a few pennies." *Wallace v. ConAgra Foods*, *Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014). "Various intangible harms can also be concrete," though they also may present more difficult and closer calls. *Ramirez*, 594 U.S. at 425. As the Court explained in *Spokeo* in the context of federal statutory claims:

> In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles. Because the doctrine of standing derives from

> the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts. In addition, because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important. Thus, we said in *Lujan* that Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." Similarly, Justice Kennedy's concurrence in that case explained that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before."

578 U.S. at 340–41 (citation modified). Examples of "harms traditionally recognized as providing a basis for lawsuits in American courts" include "reputational harms, disclosure of private information, and intrusion upon seclusion." *Ramirez*, 594 U.S. at 425.

To have standing to obtain forward-looking injunctive or declaratory relief, the plaintiff must show that she is likely to suffer future injury by the defendant and that the sought-after relief will prevent that future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). "In future injury cases, the plaintiff must demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re SuperValu, Inc.*, 870 F.3d at 769 (citation modified); *see Lujan*, 504 U.S. at 564 n.2 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (citation modified)). "Allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified). And when a plaintiff seeks forward-looking

declaratory or injunctive relief, "past injuries are relevant only for their predictive value." *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). In other words, past injuries do not by themselves show a plaintiff's standing to seek prospective relief, but they may "serve as evidence of threatened future injury." *Id.*

Many courts have applied these constitutional rules to answer whether a data-breach plaintiff has plausibly alleged an Article III injury, and though these decisions "ultimately turn[] on the substance of the allegations before each court," *In re SuperValu, Inc.*, 870 F.3d at 769, several lessons can be drawn from the cases. (1) A plaintiff who claims to have suffered identity theft or fraudulent credit charges plausibly alleges Article III injury. *Id.* at 772–73 (concluding that a plaintiff's allegation "that he suffered a fraudulent charge on the credit card he previously used to make a purchase at one of defendants' stores affected by the data breaches" showed he had standing). (2) A plaintiff who claims that a cyberattack diminished the benefit of her bargain under an express contract plausibly alleges Article III injury. *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 716 (8th Cir. 2017); *but see In re SuperValu, Inc.*, 870 F.3d at 771 n.6 (refusing to find standing on this ground based on allegation of an implied contract). (3) A plaintiff who describes the exposed data and shows it is the sort of data hackers use to perpetrate identify theft, credit fraud, or some similar bad act is more likely to plausibly show that Article III injury is certainly impending or substantially likely to occur. *See In re Change Healthcare Customer Data Sec. Breach Litig.*, 820 F. Supp. 3d 820, 837 (D. Minn. 2025) (finding that hackers' ability to use stolen information for identity theft favored concluding that plaintiffs had plausibly shown a future injury); *Johnson v. Cornerstone Nat'l Ins. Co.*, No. 22-04135-CV-C-BP, 2024 WL

5265372, at *3 (W.D. Mo. Apr. 29, 2024) (recognizing that courts consider whether the stolen data "is more or less likely to subject plaintiffs to a perpetual risk of identity theft or fraud once it has been exposed" (citation modified)); *Perry v. Bay & Bay Transp. Servs., Inc.*, 650 F. Supp. 3d 743, 751 (D. Minn. 2023) (recognizing that "the type of information stolen can be important in determining standing in a data breach case" and finding it "significant that the information here could be and has allegedly already been used to perpetrate fraud"); *Jones v. Howard Mem'l Hosp.*, No. 4:23-cv-04010, 2023 WL 12173482, at *3 (W.D. Ark. Mar. 28, 2023) ("[C]ourts more frequently conclude that an injury in fact exists where highly sensitive information, such as the plaintiff's social security number, was stolen, as opposed to a scenario in which only the plaintiff's debit or credit card numbers were stolen."). Conversely, if the exposed data "generally cannot be used alone to open unauthorized new accounts" or inflict other harms, a data-breach plaintiff is less likely to show a future injury is plausible. *In re SuperValu, Inc.*, 870 F.3d at 770 (citation modified). (4) A plaintiff who identifies the hacker responsible for the data breach and alleges facts showing that the hacker intends to exploit the data to the plaintiff's (and other similarly situated victims') detriment is more likely to plausibly show that Article III injury is certainly impending or substantially likely to occur. *In re Change Healthcare Customer Data Sec. Breach Litig.*, 820 F. Supp. 3d at 837. For example, a plaintiff may allege that the same identified hacker responsible for the sued-on data breach has breached other systems in the past and exploited stolen data to commit identity theft or make fraudulent charges on victims' accounts. *Id.* (5) A plaintiff who alleges only an increased risk of harm flowing from a data breach does not plausibly show Article III

injury. *See In re SuperValu, Inc.*, 870 F.3d at 770 (noting that "the otherwise bare assertion that '[d]ata breaches facilitate identity theft'" does not plausibly allege Article III-worthy future injury); *George D. v. NCS Pearson, Inc.*, No. 19-cv-2814 (JRT/KMM), 2020 WL 3642325, at *2 (D. Minn. July 6, 2020) ("Without evidence of harm caused by use of the stolen information, this Court will not assume that harm has occurred."). (6) A plaintiff who cannot identify an actual injury's occurrence even though relatively substantial time has passed since the data breach is less likely to plausibly allege that Article III injury is certainly impending or substantially likely to occur. *See Prestby v. A&A Servs., LLC*, No. 8:24CV204, 2026 WL 26128, at *16 (D. Neb. Jan. 5, 2026) (finding no substantial certainty of injury where, "at the time the amended complaint was filed, nearly 20 months had passed since the . . . data breach, and the plaintiffs do not allege that their Private Information, or the Private Information of any of the 2.8 million putative class members they seek to represent, was actually used to commit fraud or identity theft"). (7) Allegations made "on information and belief" that stolen data is being sold to counterfeiters and fraudsters on illicit websites or elsewhere are "speculative" and "fail to allege any injury to the plaintiffs." *In re SuperValu, Inc.*, 870 F.3d at 770 (citation modified).

Considered against these rules, the Complaint does not allege facts plausibly showing that Ms. Nunow suffered, or is substantially certain to suffer, an Article III-worthy injury. (1) Ms. Nunow does not claim to have been the victim of identity theft or fraud arising from the data breach, and the Complaint identifies no would-be class member who has. *See generally* Compl. (2) Ms. Nunow does not claim to have had an express contract with FEI, meaning the cyberattack could not have diminished the benefit of her bargain

under an express contract. *See generally id.* (3) The Complaint identifies the data "stored within [FEI's] information network" as "names, sex, dates of birth, phone numbers, Medicaid ID, last four digits of Social Security numbers, and addresses." *Id.* ¶ 1. But the Complaint also acknowledges that Ms. Nunow is "in the dark regarding what particular data was stolen," *id.* ¶ 35, and the Complaint nowhere alleges how the information on FEI's network (whether all the data, or only part of it, were stolen) might be used to perpetrate identity theft, credit fraud, or some other bad act, *see generally id.* (4) The Complaint concedes Ms. Nunow does not know who the perpetrator is. *See id.* ¶¶ 2 (describing perpetrator generically as an "unauthorized individual"); 5 (describing the perpetrator as "unknown"); 29 (describing perpetrators generically as "one or more unauthorized third parties"). Probably because the perpetrator is unknown, the Complaint's allegations regarding the perpetrator's intentions are quite high-level. *See id.* ¶¶ 5 (alleging perpetrator would "seek[] to profit off" the data breach); 32 (alleging perpetrator hacked data "with the intent of misusing" it, "including marketing and selling" it); 61 (alleging data "was taken by hackers to engage in identity theft or to sell it to other criminals who will purchase the Private Information for that purpose").[5] (5) The Complaint acknowledges that Ms. Nunow can only "speculate" regarding several key categories of facts relevant to showing

[5] The inferences that data hackers are criminals who intend to profit from the data they steal might be reasonable in some (maybe many) data breach cases, but I don't think they are reasonable here. The Department of Human Services notice of the data breach identified the perpetrator as "a user affiliated with a licensed health care provider" who "was authorized to access limited data in the system," but who "accessed more data than was reasonably necessary to perform work assignments." ECF No. 12-2 at 2. The Complaint alleges no facts tending to show that this type of breach is plausibly "criminal" in nature or undertaken for financial gain. *See generally* Compl.

Article III injury. As the Complaint describes things, Ms. Nunow and potential class members can only "speculate as to where their Private Information ended up, who has used and for what potentially nefarious purposes." *Id.* ¶ 35. The Complaint continues, alleging that "Plaintiff's and Class Members' Private Information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed Private Information for targeted marketing without Representative Plaintiff's and/or Class Members' approval." *Id.* ¶ 36. A data breach plaintiff who can only speculate regarding the hacker's identity, what specific data was stolen, if any, where potentially stolen data might end up, and how it might be used does not plausibly show that she is substantially likely to suffer Article III injury in the future.

The Complaint alleges two injury categories that warrant separate discussion, but neither category plausibly amounts to an Article III injury. In the first category are allegations regarding anxiety and similar reactions Ms. Nunow has experienced in response to, and actions she has taken to mitigate, the data breach's possible future impacts. The Complaint alleges, for example, that Ms. Nunow has experienced "annoyance," "anxiety," and "increased concerns" regarding what consequences might result from the breach. *Id.* ¶ 15. The Complaint also alleges that Ms. Nunow has "spent time dealing with the consequences of the" breach, including "exploring credit monitoring" and other steps to mitigate injuries that might result from the breach. *Id.* ¶ 13. The law is clear that, without allegations plausibly showing "a substantial risk of future identity theft" or like injury, the time a plaintiff spends weighed down by a possible adverse event or the time and money she spends protecting herself from a speculative threat are considered "self-imposed," *Beck*

*v. McDonald*, 848 F.3d 262, 276–77 (4th Cir. 2017), and "cannot create an injury," *In re SuperValu, Inc.*, 870 F.3d at 771 (citing *Clapper*, 568 U.S. at 416 (holding that a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending")). In other words, without allegations plausibly showing that a future injury is substantially certain to occur from a data breach, whatever adverse health occurrences and costs a plaintiff experiences or incurs today cannot show a present Article III injury.

In the second category are allegations regarding the breached data's monetary value to Ms. Nunow. The Complaint alleges that Ms. Nunow "suffered actual injury in the form of damages to and diminution in the value of [her] Private Information—a form of tangible property that [Ms. Nunow] entrusted to [FEI], which was compromised in and as a result of the Data Breach." Compl. ¶ 14. Here, this contention is economically implausible. The Complaint nowhere alleges the breached data's monetary value to Ms. Nunow or how she might have monetized her data. *See generally id.* Though the Complaint alleges the data had value on the "dark web," *id.* ¶ 57, it does not allege that Ms. Nunow intended to monetize her data via that or any comparable market, *see generally id.* Without allegations filling in these gaps, courts ordinarily reject a "diminished monetary value" theory as a basis for showing Article III injury. *See, e.g.*, *Fitzgerald v. Jeff Anderson & Assocs., PA*, No. 26-cv-1486 (JMB/DJF), 2026 WL 2234408, at *4 (D. Minn. Aug. 3, 2026) (rejecting diminished-monetary-value theory where plaintiff did not allege the value of his data or that he intended to monetize his data); *Prestby*, 2026 WL 26128, at *10 ("In accordance with the reasoning and holding of the majority of courts, this Court likewise rejects the

plaintiffs' claim for their diminished loss of value of their PII. The plaintiffs did not allege that but for the data breach, they could have monetized their Private Information, or that it was actually monetized on the black market."); *Pulliam v. W. Tech. Grp., LLC*, No. 8:23-CV-159, 2024 WL 356777, at *8 (D. Neb. Jan. 19, 2024) (rejecting diminished-monetary-value theory because plaintiffs failed to identify how this harm resembled "a harm traditionally recognized as providing a basis for a lawsuit in American courts" (citation modified)). The same result is appropriate here.

*

"When it becomes clear a case originally filed in federal court does not belong there because the plaintiffs lack Article III standing, generally the appropriate remedy is to dismiss *without prejudice*." *Wallace.*, 747 F.3d at 1033. "If, on the other hand, the case did not originate in the federal court but was removed there by the defendants, the federal court *must* remand the case to the state court from whence it came." *Id.* (first citing 28 U.S.C. § 1447(c); and then citing 28 U.S.C. § 1453(c)(1)); *see Schumacher v. SC Data Ctr., Inc.*, 33 F.4th 504, 514 (8th Cir. 2022) (same); *see also Marco Techs., LLC v. Midkiff*, No. 19-cv-2323 (PJS/LIB), 2021 WL 1577653, at *1 (D. Minn. Apr. 22, 2021) ("*Wallace* unambiguously holds that where a district court lacks subject-matter jurisdiction over a removed case, remand rather than dismissal is required."). For this reason, this case will be remanded to Ramsey County District Court.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Defendant FEI.COM, Inc.'s Motion to Dismiss [ECF No. 9] is **GRANTED** for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

2. This case shall be **REMANDED** to Minnesota District Court, Second Judicial District (Ramsey County) pursuant to 28 U.S.C. § 1447(c).

Dated: August 27, 2026

s/ Eric C. Tostrud
Eric C. Tostrud
Chief Judge, United States District Court